[Civ. No. 1030.  Third Appellate District.—April 17, 1913.]

FREDERICK WEIK, Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation), Appellant.

NEGLIGENCE—TURNTABLE NEAR HIGHWAY—LIABILITY OF RAILROAD TO CHILDREN.—A railroad company which maintains a turntable unlocked and unguarded near a public highway is liable for personal injuries received by a boy ten years old from playing with or riding on it.

ID.—CONTRIBUTORY NEGLIGENCE OF BOY.—The question of contributory negligence of a boy ten years old in playing on the turntable is for the jury.

ID.—CHILDREN—AGE WHEN ACCOUNTABLE FOR ACTIONS.—There is no precise age at which, as a matter of law, a child is to be held accountable for his actions to the same extent as an adult.

ID.—BROKEN LOCK OF TURNTABLE—KNOWLEDGE OF RAILROAD.—An instruction that if the jury should find that the railroad company did not break or cause to be broken the fastenings of the turntable, but that the same were broken without its knowledge or consent, the verdict should be for the defendant, is properly refused. It omits the qualification of knowledge attained by the exercise of ordinary care.

ID.—NEGLIGENCE OF PARENT—INSTRUCTIONS.—An instruction that a parent who permits his child to play in places where or with instruments or appliances with which he knows, or as a reasonable person ought to know, the child is liable to be injured, cannot recover damages for injury to the child, is properly refused. It ignores the defendant's negligence as a possible or probable cause of the injury.

APPEAL from an order of the Superior Court of Napa County refusing a new trial. Henry C. Gesford, Judge.

The facts are stated in the opinion of the court.

F. E. Johnston, and L. E. Johnston, for Appellant.

Edw. S. Bell, and Clarence N. Riggins, for Respondent.

CHIPMAN, P. J.—Plaintiff brings the action for damages resulting from an injury to his minor child while playing on a turntable on defendant's property near its depot at West Napa. The cause was tried by a jury and plaintiff had a verdict for five hundred and seventy-five dollars. Defendant appeals from the order denying its motion for a new trial.

Reliance for a reversal of the judgment is based upon three grounds—namely: 1. That plaintiff was guilty of contributory negligence "which was the cause of his son Albert's injuries"; 2. That plaintiff's son "was of such an age and understanding that he was capable of knowing and appreciating that the turntable was a dangerous thing to play on and that he might be injured in so doing, and that he was guilty of contributory negligence which was the proximate cause of his injury," and 3. That the court erred in its instructions to the jury and in refusing to give certain instructions requested by defendant.

Defendant, on September 14, 1910, the date of the accident, was operating a branch line of its main road from West Napa to Sausalito and, near its depot or near its track in West Napa, it maintained a turntable which was about twenty feet from a public road and was not inclosed or guarded in any way. Several families besides plaintiff's resided in the immediate neighborhood. His property adjoined the right of way of the defendant and he lived with his wife and two children about 125 yards distant from the turntable. To reach the

public road he had to cross the railroad right of way. Plaintiff was a painter and usually was away from home during the day in the city of Napa. His wife also worked in Napa at a shirt factory. The son, Albert, who was injured, was a few days past ten years of age and attended school. When not in school or doing work around his home he and his brother played in the neighborhood wherever they chose. Plaintiff's children and others of the neighborhood passed along the public road and by this turntable in their daily travels or sports.

Plaintiff was of foreign birth and testified by means of an interpreter. The family had lived in West Napa about a year and a half at the time of the accident. Plaintiff testified, on cross-examination: "I never cautioned my boys or forbid them to go upon the railroad tracks, nor did I ever forbid them from playing around the freight cars standing on the tracks or playing on the turntable. I did not forbid them from playing on the turntable for I did not know that it was a turntable and did not have any interest there at all, or know that any one was forbidden to go about it. I did not warn them to keep off the railroad tracks because I did not know that it was forbidden for children to be on the track. I did not know before the accident that the turntable would turn. I did not know that it was dangerous for children to play about it. I knew it was dangerous for children to be on the railroad tracks when trains were coming, but everybody else passed along the railroad tracks at various times and I did not think there was any danger save when trains were passing. My children left home for school about 8:30 in the morning, returned home at noon for lunch and after school was over would return home about 3 or 3:30. After school they did such work as gathering wood, tending the garden and watering the garden—at other times would go out and play. I did not know they were out playing at the time of the accident—until after it happened. I had not warned the children not to go out and play on the day of the accident. If there was work for them to do at home I would tell them what to do in the morning before I left for work and if not I allowed the children to play as they chose after school. I did not know where the children went to play, they went wherever they wanted to."

On cross-examination Mrs. Weik testified: "I was working at the Cameron Shirt Factory when my son was hurt and did not learn of his injury until after I reached home after the factory closed at 5:30. I had been working at the factory for about a year prior to the time of the accident. I did the housework at home and the children, to a great extent, took care of themselves. They reached home as a rule between 3 and 3:30 o'clock P. M. They would then do the work, if any, I had told them in the morning to do and would then go out and play. I never forbid them to go out and play after they had finished their work. I warned them to be careful about playing on the railroad tracks when the trains were coming and going. I never knew or heard of the children playing on the turntable prior to the accident. I did not know where they played. I did not go back to work at the factory until one or two days less than three weeks after the accident. Before my son was hurt he did garden work, housework and got up the wood, and is doing the same kind of work at the present time."

A turntable was originally built between Lynn and Orndorff streets in 1905, but it was replaced at the same point by the present one in May, 1910, but was not much used. On September 3, 1910, on the occasion of the coming of a circus to Napa, it was thought necessary to use it and on that day it was examined and was found properly locked. It happened, however, when put to use it would not revolve on account of the weight of the locomotive. On September 4, 1910, it was examined by the section foreman, Bottarini, who testified that it was part of his duty to look after it, and was found properly locked. It is not necessary to describe its construction. Suffice it to say that unless locked boys or other persons could easily revolve it. Bottarini testified: "It was my duty to inspect the turntable and see if it was O. K., inspect everything. The turntable was only used once, or attempted to be used once, during the year 1910. That was on September 3d when they tried to use it . . . for the circus. . . . At that time the turntable was fastened and locked with a patent switch lock." He examined it again on the 4th to see what was the reason it did not work the day before. He testified: "On September 4th the turntable was fastened and locked. The next time I visited the turntable was on September 20th when I heard

from the station agent that the boy had been hurt. The turntable had not been used or attempted to be used between the 3d and 20th days of September. . . . I found the staple was pulled out and was broken in two, but the lock was still there and locked." On cross-examination he testified: "I have occasionally seen children playing on the table, but always warned them to keep off and ran them away. I was instructed by the company to keep the turntable locked. I knew that children in the neighborhood were in the habit of playing on that turntable and saw them there once in a while. I told them there was danger and ran them off."

Witness Babb, called by defendant, testified: "I have seen children turning that turntable previous to the time of this boy getting hurt. I could not state how long it was, probably two or three or four days. I would not state but I know I saw them turning the turntable. I have a faint recollection about going out there and cautioning the children as a friend and father would, that they ought not to do this for fear of an accident, they might get hurt, but what children they were I do not know. . . . I warned these boys because I recognized that it was a dangerous contrivance for boys to play with." Witness Crawford, defendant's roadmaster, testified: "The track foreman never made any complaint to me that children were or had been playing on the turntable. If the turntable was not locked with a lock through the staple any one could lift the latch and the turntable would then be free to move." It was shown that, at the time of the trial, in February, 1912, the boy, Albert, stood well in his classes at school and was brighter than average boys of his age and his cross-examination showed him to be possessed of quick apprehension and good intelligence for one of his age. How much of this brightness was due to his experience in the year and a half after he was injured can only be conjectured. The facts were brought out, no doubt, to meet plaintiff's claim that the boy's immature age should be considered in judging of any contributory negligence attributed to him by defendant.

The foregoing is a fair statement of the situation at the time plaintiff's boy appears at the turntable. What there happened comes entirely from the boy's testimony. The following is his testimony in chief: "What were you doing on that turntable before you got hurt? A. I was not on the turn-

table before I got hurt. Q. You were playing at the turntable, were you not? A. Yes. Q. You were playing at the turntable? A. Yes. Q. What was you doing at the turntable? A. Playing. Q. Playing? A. Yes. Q. How? A. Turning the turntable around. Q. And riding on it? A. Yes. Q. You turned the table around and then jumped on and rode aways? A. Yes. Q. Was any one else with you? A. My brother and Martin Landers. Q. Those were the two boys? A. Yes. Q. Now, how did you get hurt? A. I was trying to get on the turntable and I slipped down and got caught in. Q. You got caught. Got caught between the turntable and the end piece that runs across at the head of the table? A. Yes. Q. Now, where did you get caught, whereabouts on your body? A. On my right side. Q. Just stand up and show the jury. A. Right through here (indicating.) Q. Caught you and squeezed you; were you able to walk after that? A. No. Q. What was done with you; just sit down again. A. I crawled on my knees a little ways and then they took me home. Q. Took you home and put you to bed? A. Yes. Q. Did you do anything to the lock of that turntable that day so you could swing it around? A. No. Q. When you went there you found it unlocked? A. Yes.'' His remaining testimony in chief related to his injury and, as no question is raised as to its extent of the reasonableness of the verdict, this class of evidence will not be noted.

The cross-examination was pursued at great length. We will quote sufficient to fairly present the circumstances surrounding the accident. He testified: ''I had never played on the turntable before the day I was hurt. Q. How did you come on the turntable that day? A. Oh, us boys, we were thinking about having some fun, just like the merry-go-round, push it around and jump on it and have a ride. Q. And when you got there you found it unlocked? A. Yes. Q. Wasn't there two catches, wasn't there a big flange like that to keep it from turning around? A. No. Q. Nothing there at all? A. No. Q. Don't you remember right at the end— A. (Interrupting.) Yes, I saw those blocks but they were not locked. Q. They were not locked, but you had to lift them up? A. I don't know about that; I did not see them. Q. You don't know anything about that now, you

don't remember about that? A. No. Q. Who suggested that you turn the turntable around? A. I don't know. Q. Don't know which one of the boys it was? A. No. Q. And which way was this turntable going? A. I was turning this way, around that way, and I tried to jump on and I slipped and the end caught me on the buckle and I got caught in the turntable. Q. Now, who was turning the table, who was running it around when you got hurt? A. Well, I was, turning and my brother and Martin Landers. We would turn and while we were turning yet I jumped on, and then I slipped down and got caught in it. . . . Q. When you slipped down you saw you were going to get caught. A. No. Q. Didn't you see you were going to get caught? A. No, I did not think of that. . . . Q. You knew if your feet did get down there you would get caught? A. When I was on. You can tell when you are coming to danger when you are on a thing. Q. You can see when you are getting in danger? You could see if you left your legs down there— A. (Interrupting.) Yes, but I did not think of that first. Q. You did not know you were going to slip? A. No. . . . Q. You did not know from that great big log there, that great big turntable, that if you got caught between there you would get hurt? A. Didn't think of it. Q. You did not expect to get hurt, did you? A. No, I did not expect and I did not think I was going to get hurt. Q. You did not think of getting hurt; you knew if you—if you got in between there you would get hurt? A. No, I did not know that. Q. Didn't you know if you got in between those big logs it would hurt you? A. I knew it after; when I was out of it again I knew it. . . . Q. Albert, you knew what this turntable was for, didn't you? A. Oh, for the engines to turn around; I knew that. Q. You knew that the railroad people used it, didn't you? A. I didn't see them use it, you said. I do not know if they used it or not. Q. You knew what it was there for? A. Yes, I knew what it was there for. Q. You knew it was part of the railroad property? A. Yes. Q. And belonged to the railroad? A. Yes. Q. They did not ask you to go there and play with it, did they? A. No. Q. You knew it was not yours, didn't you? A. Yes. Q. And you knew that you ought not to be there, didn't you? A. No. Q. Didn't you know you had no right to be there? A. No.

Q. You think they wanted you there? A. I thought they didn't care because it was not fenced in or nothing. . . . Q. You said, Albert, you did not know before you got hurt, you did not think—you did not know you would get hurt on the turntable? A. No. Q. Before you did get hurt, didn't you know that you were going to get hurt? A. If I knew I was going to get hurt I would not have gone on there. Q. You knew all the time if you got caught between those two big logs you would get hurt? A. I did not think of it. Q. You did not expect to get hurt? A. I did not think of that at all. Q. You thought you could scramble up out of the way; you knew it, Albert? A. I knew it. Q. You knew if you caught in there you would get hurt? A. I didn't think I would. Q. You did not think you would get caught; you knew if you went and stood right in there where this came together and the boys should swing it round— A. (Interrupting.) I did not look at that place. Q. You did not think about it at all? A. No. Q. But you knew it, didn't you? A. Well, after I got hurt I knew it."

One cannot but be impressed with the candor and frankness exhibited by this lad in his answers. He does not appear to have tried to conceal any fact connected with his experience in manipulating this turntable and riding on it. His consciousness of the danger came to him after he was hurt and not before. He had never seen the turntable operated and it had in fact not been used during the entire year 1910. He had never been on it before though he saw it and knew what it was intended for. He and his companions found it unlocked and in a condition to be used as a plaything and his answer to the question how he came to go there tells the whole story —"Oh, us boys, we were thinking about having some fun, just like the merry-go-round, push it around and jump on it and have a ride." He had gone around on the table successfully several times and, as near as can be seen from his explanation, he was hurt because he slipped down into a position of danger which he had not foreseen, of which he naively said: "I knew it after I got hurt." When questioned as to his right to go there and his knowledge that it was railroad property, his answers were that he said he knew what the turntable was for and that it belonged to the railroad company, but he said he did not know he had no right to be there

and he "thought they didn't care because it was not fenced in or nothing." We do not think it necessary to comment further on this boy's account of his actions. It seems to us that he did what boys of his age and knowledge would have done with an attractive piece of machinery such as this, and exposed as this turntable was. In its unlocked condition, near to the highway, uninclosed and unguarded in any way, it was an invitation to boys to do the very thing with it that resulted in the injury here complained of.

The principle governing this case is fully stated in *Barrett* v. *Southern Pacific Co.,* 91 Cal. 296, [25 Am. St. Rep. 186, 27 Pac. 666]. The facts in the present case pointing to defendant's negligence are less excusatory than were the facts in the case cited. Said the court: "If defendant ought reasonably to have anticipated that leaving this turntable unguarded and exposed, an injury such as plaintiff suffered was liable to occur, then it must be held to have anticipated it, and was guilty of negligence in thus maintaining it in its exposed position. It is no answer to this that the child was a trespasser. . . . In the forum of law as well as of common sense, a child of immature years is expected to exercise only such care and self-restraint as belong to childhood and a reasonable man must be presumed to know this and is required to govern his actions accordingly. It is a matter of common experience that children of tender years are guided in their actions by childish instincts, and are lacking in that discretion which is ordinarily sufficient to enable those of mature years to appreciate and avoid danger, and, in proportion to the lack of judgment on their part, the care which must be observed towards them by others is increased." In the case cited the turntable was fastened in the way usual among railroad companies at that time, i. e., with a latch and slot to keep it from revolving. In the present case a method more effective was used, so that when locked the turntable could not be moved. But the evidence was that defendant's servant whose business it was to inspect and look after the turntable did not see it, after September 4th, until September 20th, and then because he was told of the accident which happened on the 14th. And this same employee of defendant knew that boys had been in the habit of playing on it. We entertain no doubt of defendant's negligence in the matter and we do not think that the facts

would warrant us in holding that the injury can reasonably be attributed to the boy's contributory negligence. The principles involved in this class of cases are quite fully discussed in *Cahill* v. *Stone & Co.,* 153 Cal. 571, [19 L. R. A. (N. S.) 1094, 96 Pac. 84]. In that case the injured boy was twelve years of age. Upon the question of his capability to exercise care for his own safety the court said: "There is no precise age at which, as a matter of law, a child is to be held accountable for all his actions to the same extent as one of full age." Quoting from *Consolidated etc. Ry. Co.* v. *Carlson,* 58 Kan. 66, [48 Pac. 635], the court said: "The question of the capacity of a particular child at a particular time to exercise care in avoiding a particular danger, is one of fact, falling within the province of a jury to determine." In that case the child referred to was ten years old. In another case cited where the same rule was applied, the boy was fourteen years old. Said the court, in *Cahill* v. *Stone & Co.:* "There is, however, no conclusive presumption that a twelve-year old boy is able to foresee such danger, or that he has sufficient wisdom to avoid it. The question is one of fact to be shown by the evidence."

Defendant requested certain instructions marked "A" and "B" respectively. Both are predicated upon the proposition that defendant should have the verdict unless the jury should find in the one case that the defendant "knew that said lock was broken or unlocked," and, in the other, that defendant "cannot be charged with negligence in failing to inspect or examine said turntable or lock . . . unless it shall further appear from the evidence that said defendant knew that said lock had been broken or unlocked and failed to relock or fix the same." The court gave the instructions as requested by inserting after the word "knew" the words "or by the exercise of ordinary care could have known." We think the modification was proper.

Instruction marked "C" was refused. It charged that if the jury should find that defendant did not break or cause to be broken the fastenings but they were broken without its knowledge or consent and remained broken without the knowledge or consent of defendant, the verdict should be for defendant. This instruction omits the qualification, as in "A"

and "B," of knowledge obtained by the exercise of ordinary care.

Instruction marked "D" was refused. "A parent who permits his child to play in places where, or with instruments or appliances with which he knows or as a reasonable person ought to know the child is liable to be injured, and such child is injured while playing in such places, or with such instruments or appliances, cannot recover damages for such injury to such child." Contributory negligence was not alleged of either parent in the answer. As, however, evidence on that point was admitted without objection, the most that appeared was that neither of the boy's parents had forbidden him from playing with the turntable. There was no evidence that they permitted it and the boy's father testified that he knew nothing about the turntable. Furthermore, the instruction ignores altogether the defendant's negligence as a possible or probable cause of the injury.

We discover no prejudicial error and the order is, therefore, affirmed.

Hart, J., and Burnett, J., concurred.